UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA, NORTHEASTERN DIVISION

| | | | |
|---|---|---|---|
| UNITED STATES | ) | | |
| v. | ) | Case Nos. | 2:18-CR-0249-LSC-JHE |
| KENNETH EARL HOOKS, | ) | | 2:19-CR-0136-LSC-JHE |
| Defendant. | ) | | |

SENTENCING MEMORANDUM & MOTION FOR DOWNWARD VARIANCE

COMES NOW Defendant KENNETH EARL HOOKS, through counsel, and respectfully submits this updated sentencing memorandum and attached materials in support of a total sentence of 60 years in custody, followed by a lifetime term of supervised release. In support, he states:

Mr. Hooks's combined cases are coming before the Court for resentencing upon remand from the Eleventh Circuit. At a resentencing hearing, the Sentencing Guidelines remain advisory and the same sentencing framework set forth in *United States v. Booker*, 543 U.S. 220 (2005), and its progeny applies. *See Pepper v. United States*, 562 U.S. 476, 490 (2011) (holding that *Booker* framework "applies both at a defendant's initial sentencing and at any subsequent resentencing after a sentence has been set aside on appeal"). In addition to the information submitted at Mr. Hooks's original sentencing, this Court may consider post-sentencing rehabilitation as part of its assessment of the 18 U.S.C. § 3553(a) factors. *Pepper*, 562 U.S. at 481. Mr. Hooks therefore submits under seal an updated assessment by Dr. Boyd for the Court's consideration, which indicates that Mr. Hooks is responding to treatment.

Mr. Hooks also submits an updated letter from Mr. Hooks's daughter, Samantha Hooks, and screenshot from the inmate locator on the Bureau of Prison's website showing that Mr. Hooks's codefendant's scheduled release date is April 25, 2032.

Mr. Hooks maintains that a total sentence of 60 years is the only reasonable sentence in this case. It is almost four times the sentence received by his co-defendant, who will be released in less than 10 years. Imposing a sentence above 60 years on Mr. Hooks would create an unwarranted disparity between Mr. Hooks and his co-defendant.[1] A 60-year sentence is also consistent with other similarly situated defendants convicted of similar crimes. The average sentence imposed for producing child pornography is about 22 or 23 years' imprisonment. *See* U.S. SENTENCING COMMISSION, REPORT TO CONGRESS: FEDERAL CHILD PORNOGRAPHY OFFENSES 253 (2012) (noting that the average sentence imposed on production offenders was 282.9 months in 2009 and 267.1 months in 2010). The Eleventh Circuit has affirmed similar sentences as reasonable, even in cases involving aggravated conduct. *See United States v. Lebowitz*, 676 F.3d 1000, 1017 (11th Cir. 2012) (affirming 320-month sentence as reasonable for producing child pornography, where defendant sexually assaulted two 15-year old boys and

---

[1] The sentence should reflect "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Mr. Hooks and Ms. Morris have similar records and have been found guilty of similar conduct. Mr. Hooks does not deny that some disparity is warranted because Ms. Morris cooperated with law enforcement to help them arrest Mr. Hooks. But that cooperation does not warrant a disparity of over forty-three years between their sentences. In our district, substantial cooperation normally earns a defendant a sentence reduction of between 20 and 50 percent. Mr. Morris's reduction, even off of the requested sentence, represents a sentence reduction of over 70 percent.

exposed them to risk of HIV infection); *United States v. Guite*, 652 F. App'x 829, 834 (11th Cir. 2016) (unpublished) (affirming 780-month sentence where defendant produced child pornography by sexually molesting his own children, ages three and five); *United States v. Kapordelis*, 569 F.3d 1291, 1316-17 (11th Cir. 2009) (affirming 420-month sentence as reasonable for producing child pornography, where defendant had been drugging and molesting minors for at least twenty years).

The requested sentence maintains parity between Mr. Hooks, his co-defendant, and other similarly situated defendants. As argued at his original sentencing hearing, it also is supported because (1) Mr. Hooks accepted responsibility for his offense and pleaded guilty, allowing the government and the victims to avoid a time-consuming and painful trial; and (2) two contributing factors to Mr. Hooks's offense were his complex post-traumatic stress disorder and severe methamphetamine addiction, both of which were the result of enduring years of extreme childhood abuse and both of which are amenable to treatment.

Regarding the first factor, granting leniency to defendants who plead guilty and accept responsibility has a long tradition in our courts. *United States v. Henry*, 883 F.2d 1010, 1012 (11th Cir. 1989) ("Since long before the enactment of the guidelines, American courts have been allowed to take into account the defendant's acceptance of the responsibility for his wrongs as a consideration in sentencing."). The Sentencing Guidelines, in USSG § 3E1.1, merely "formalizes and clarifies that tradition of leniency." *Id.*

Mr. Hooks's offense level was reduced under the acceptance-of-responsibility guideline, USSG § 3E1.1. But as a practical matter, that reduction had no impact on his ultimate offense level and sentencing range because it was calculated to be the statutory maximum of life. In *Rodriguez*, the Eleventh Circuit held that district courts had discretion to depart downward under such circumstances, where the ultimate guidelines range negated the sentence reduction a defendant would have received for accepting responsibility. *United States v. Rodriguez*, 64 F.3d 638, 643 (11th Cir. 1995). In reaching this conclusion the court explained that U.S.S.G. § 3E1.1 "suggests that the Commission contemplated that a defendant always would receive some benefit at sentencing for accepting responsibility for his conduct" and a defendant will have less incentive to forego trial "if a guilty plea will not be rewarded with sentencing leniency." *Id.*

Regarding Mr. Hooks's history and characteristics, this Court should consider that the abuse Mr. Hooks suffered as a child was extreme. "School was 'fun,'" was the only positive recollection that Mr. Hooks could muster during a four-and-a-half hour interview with forensic psychologist Sara Boyd, Ph.D. (No. 18-249, Doc. 53, pp. 1, 4.) When asked what he liked about school, Mr. Hooks replied, "They feed you." *Id.* at 4. When asked whether there was anything he disliked about school, Mr. Hooks became tearful and said, "They make you leave." *Id.*

Outside of school, Mr. Hooks encountered violence, substance abuse, sexual assault, and abject neglect on such a routine basis that he understood it to be only normal. *Id.* at 3–4. To Dr. Boyd, he described "conditions consistent with neglect,

but did not seem to appreciate that he was neglected." *Id.* at 3. His parents "were often reportedly too intoxicated to supervise or care for the children." *Id.* When he was a toddler, Mr. Hooks's parents separated and Mr. Hooks's father took custody of him. *Id.* at 4. His father "[b]y all accounts . . . had substance abuse and behavioral problems that manifested as aggression, severe irresponsibility, and abusive behavior." *Id.* at 3. He was a 'two-timing drunk that didn't give a damn what he done to anyone.'" *Id.*

Meanwhile Mr. Hooks's mother, who also "had a lifelong pattern of major substance abuse disorder," drifted from one violent relationship to another. *Id.* Mr. Hooks reported that he had seen her victimized by "[h]er dad, my dad, her husband, . . . Everybody was like that." *Id.* He recalled seeing his mother threatened with weapons and struck with a two-by-four board. *Id.* Mr. Hooks was also the target of physical abuse by multiple family members, although he characterized it as "fighting." *Id.* When asked if he was ever injured, he reported getting "choked out" and having bruises on his "face, hands, everything." *Id.* And according to Mr. Hooks's step-father, Tommy Holder, it became "common knowledge" that Mr. Hooks "was repeatedly raped and abused by his father, uncle, and three older cousins," beginning as a young child and continuing into his early teenage years. *Id.; see also* PSR, ¶¶ 93, 101. When Dr. Boyd asked him about this, he confirmed it but "began rocking back and forth . . . and crying," so she did not press him for more information. (No. 18-249, Doc. 53, p. 3.) Mr. Holder opined that Mr. Hooks needed

mental health treatment as a child, but that his father never took him "out of fear of being exposed." PSR, ¶ 101.

Mr. Hooks was described by his step-father as an odd and compulsive child, who had problems with bedwetting, nightmares, and sleep disruptions. (No. 18-249, Doc. 53, p. 4.) He first attempted suicide at age 16, via hanging, and estimated a lifetime total of more than a dozen suicide attempts. *Id.* at 6. As a teen, he was briefly treated at Griel Psychiatric Hospital. PSR, ¶ 105. Mental health providers over the years noted symptoms of depression, anxiety, bipolar disorder, and post-traumatic stress disorder as a result of the extreme sexual abuse he suffered as a child. *Id.; see also* No. 18-249, Doc. 53, p. 6.

The type of abuse and neglect that Mr. Hooks's experienced as a child has repeatedly been held directly relevant to assessing moral culpability. *See Wiggins v. Smith*, 539 U.S. 510, 512–13 (2003) ("Wiggins experienced severe privation and abuse while in the custody of his alcoholic, absentee mother and physical torment, sexual molestation, and repeated rape while in foster care. . . . He thus has the kind of troubled history relevant to assessing a defendant's moral culpability."); *Williams v. Taylor*, 529 U.S. 362, 398 (2000) ("the graphic description of Williams' childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability."); *Debruce v. Comm'r, Alabama Dep't of Corr.*, 758 F.3d 1263, 1277 (11th Cir. 2014) (explaining that defendant "had suffered abuse during his childhood and had been routinely exposed to violence," which was "relevant to assessing a defendant's moral

culpability"). It further supports that a 60-year sentence is the only reasonable sentence in this case.

Even accounting for good time, Mr. Hooks will be into his 80s by the time he is released from the requested sentence. It is plenty sufficient to satisfy the statutory sentencing factors. In light of all of the above and the supporting attachments and previously submitted materials, Mr. Hooks respectfully requests a total sentence of 60 years in custody, followed by a lifetime term of supervised release.

Respectfully Submitted,

KEVIN L. BUTLER
Federal Public Defender

/s/ oswald
Deanna Lee Oswald
Assistant Federal Defender
200 Clinton Avenue West, Suite 503
Huntsville, AL 35801
256-684-8700 (t)    256-519-5948 (f)
deanna_oswald@fd.org

CERTIFICATE OF SERVICE

I certify that on May 23, 2022, the foregoing was filed with the Clerk of Court and docketed electronically using this Court's CM/ECF system, which will provide notice to counsel of record.

/s/ oswald
Deanna Lee Oswald